IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| D. L., by his parents and next friends, | ) | |
| FRANCES LANDON and MOLLYJAYNE | ) | |
| LANDON, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | No. __17-cv-01773__ |
| | ) | |
| ST. LOUIS CITY SCHOOL DISTRICT, | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

Plaintiff D.L., by his parents and next friends, Frances Landon and MollyJayne Landon,

by their attorneys, complaining of the Defendant St. Louis City School District, seeking reversal

of a special education hearing decision that was not in their favor pursuant to 20 U.S.C. §

1415(i)(2)(A), and state as follows:

### PARTIES

1.      Plaintiff D.L. is a ten-year old boy who resides with his parents, Frances Landon

and MollyJayne Landon, in the City of St. Louis, Missouri.  He is an adoptee.  He has an

educational diagnosis of other health impairment ("OHI") and medical diagnoses of Autism

Spectrum Disorder, Post-Traumatic Stress Disorder, ("PTSD"), and Attention Deficit

Hyperactivity Disorder ("ADHD").  He also suffers from chronic constipation with enuresis and

encopresis.

2.      Defendant St. Louis City School District ("SLPS") is the governmental unit that is

responsible for administering public special education schools, programs and services within the

area it serves.  The Superintendent of SLPS is Dr. Kelvin R. Adams and its main administrative

offices are located at 801 N. 11th St., St. Louis, Missouri 63101.

1

## JURISDICTION AND VENUE

3.     This Court has jurisdiction of this case pursuant to 20 U.S.C. §1415(i)(2)(A) of the Individuals with Disabilities Education Act ("IDEA") and 28 U.S.C. §1331.  Declaratory relief is authorized by 28 U.S.C. §§ 2200, 2201.

4.     Venue is proper in this Court because the acts complained of occurred within the Eastern District of Missouri.

## STATUTORY FRAMEWORK

5.     The IDEA was enacted to provide a free appropriate public education to all children with disabilities in the United States.  The IDEA confers upon disabled students and their parents an enforceable substantive right to public education along with a variety of procedural safeguards to assure that the rights of disabled children and their parents are protected.

6.     The IDEA conditions federal financial assistance upon a state's compliance with the IDEA's substantive and procedural requirements.  States, like Missouri, that qualify for federal funds and local educational agencies, like Defendant SLPS, that receive such funds must develop policies assuring all children with disabilities are provided a free appropriate public education.

7.     The primary vehicle for implementing the IDEA's statutory goals is the individualized education program ("IEP"), which is mandated for each child with a qualifying disability by both the IDEA and Missouri law.  The IEP sets out the student's present level of educational performance, establishes measurable annual goals related to meeting the child's educational needs, and includes a statement of the student's special education and related services required to meet those goals.  The IEP must be developed prior to the initiation of

2

special education services.  The IEP must be reviewed by the IEP team at least once a year, or

more often if the parents or school ask for a review.  If necessary, the IEP may be revised during

the IEP meeting.  Parental participation is required in both the development and review of the

student's IEP.

        8.      The IDEA and Missouri law establish procedural safeguards to guarantee

meaningful parental input into all decisions affecting a child's special education.  Among these

safeguards is the right to seek administrative and judicial review of any special education

placement decision if the parents believe the placement is inappropriate.

        9.      In Missouri, at all relevant times herein, the programs and procedures to achieve

state compliance with the IDEA and its implementing regulations are set forth at Mo. Rev. Stat.

§162.670 *et seq.* and the Missouri Regulations for Implementing Part B of the IDEA, Missouri

Department of Elementary and Secondary Education, (2007) (hereinafter, "the State Plan").

## STATEMENT OF FACTS

      10.      When D. L. began public school, he was in foster care.  In all, he lived in seven

foster homes before he was placed with Plantiffs Frances and MollyJayne Landon ("Parents") in

2013[1].  Prior to his placement with the Landons, D.L. attended Kindergarten in various districts,

including SLPS.  Eventually, pursuant to his IEP at the time, D.L. was placed at Epworth City

School, a private separate school, where D. L. repeated kindergarten (2012-2013) and attended

first grade (2013-2014).

      11.      After D. L. began living with Parents he continued to attend Epworth for first

grade.  His initial educational diagnosis was emotional disturbance ("ED") and his medical

diagnosis at that time was ADHD.  Because Parents were concerned with D.L.'s lack of

---

[1] Frances and MollyJayne Landon formally adopted D.L. on June 15, 2015.

progress at Epworth, they sought outside assistance to help them address D.L.'s needs. Parents received extensive training from Easter Seals Midwest and received assistance and services from the St. Louis Office for Developmental Disability Resources and the St. Louis Arc. Evaluators from Easter Seals Midwest diagnosed D.L. with Autism Spectrum Disorder, and that diagnosis was later confirmed by D.L.'s psychiatrist, Dr. John Constantino, and evaluators from Mercy Children's Hospital's Autism Center.

12.    SLPS reevaluated D.L. in March 2014, after which SLPS changed his educational diagnosis to other health impaired ("OHI"). At that time, SLPS rejected an educational diagnosis of autism even though his autism diagnosis had been confirmed by several of D.L.'s medical providers. D.L.'s experiences in first grade were extremely negative. As a result, he was hospitalized in a psychiatric hospital on two separate occasions for suicidal and homicidal ideations. Although these hospitalizations were directly related to D.L.'s school experiences, SLPS did not obtain D.L.'s medical records, did not contact any of D.L.'s doctors, and did not modify his IEP to address D.L.'s experiences at school that necessitated the hospitalizations.

13.    Dr. John Constantino has been D.L.'s psychiatrist since 2012 and has seen him at least 25 times since then. Among other things, Dr. Constantino is the director of the Division of Child Psychiatry at St. Louis Children's Hospital. Dr. Constantino began to see D.L. when he was in foster homes and has continued to see him after he was fostered and then adopted by Parents. Dr. Constantion participated by telephone in IEP meetings with SLPS regarding D.L. to explain D.L.'s diagnosis and appropriate programming for D.L. Unfortunately, SLPS did not record these calls or the information conveyed by Dr. Constantino in any of D.L.'s records.

14.    During the 2014-2015 school year, D.L. attended second grade at Mullanphy Elementary School in the City of St. Louis. His educational diagnosis remained OHI, but he was

4

placed in a self-contained class for students with autism. He made significant academic progress and his social skills significantly improved. For example, his toileting skills improved to the extent he no longer had to wear pull-ups. He learned to read for enjoyment, and he could read materials at least one grade level ahead. Unlike prior years, D.L.'s experiences in second grade were extremely positive and he enjoyed attending school. During the summer following second grade, D.L. attended the Children's School of Science in Woods Hole, Massachusetts, where he performed well for three weeks and did not require any accommodations.

15.     On March 26, 2015 of D.L.'s second grade year, the IEP Team again rejected an autism educational diagnosis and placement in an autism specific program. The team did so even though all D.L.'s medical providers confirmed his autism diagnosis. The team did so even though all its new testing, including a test developed by Dr. Constantino, showed "likely" results for Asperger Syndrome Disorder, a less severe form of autism.

16.     For third grade (2015-2016), over Parents' objection, SLPS removed D.L. from the self-contained autism classroom and moved him D.L. in a cross-categorical class at Mullanphy Elementary School for students with different types of disabilities. Most of the students in the cross-categorical class had behavioral disorders. Almost immediately, D.L.'s behaviors began to deteriorate and his academic progress stalled. He began modeling many of the negative behaviors of his peers. In addition, D.L. had increased toileting accidents and regressed to the extent of wearing pull-ups again. D.L. cried and begged his parents not to take him to school, and when he was forced to go, refused to do his schoolwork and sat in a corner by himself. D.L. became depressed, anxious, and made serious suicide threats. Despite this, SLPS made no changes to D.L.'s IEP goals or objectives.

17.     During D.L.'s second grade year, he had zero hospitalizations.  After D.L. was transferred to the cross-categorical class in third grade, D.L. required hospitalization in a psychiatric hospital on at least four occasions during or immediately after the 2015-2016 school year.  He also attended a hospital out-patient program at the end of the 2015-2016 school year. Each hospitalization was directly related to D.L.'s negative school experiences in his cross-categorical class.  SLPS was aware of each hospitalization but did not mention any of D.L's hospitalizations in his IEP, did not obtain any of D.L.'s medical records, and did not contact any of D.L.'s doctors.

18.     Feeling as though SLPS was not taking their concerns seriously, Parents attempted to locate a private school that would accept D.L. prior to enrolling him at SLPS for fourth grade.  When they were unsuccessful, D.L. returned to Mullanphy Elementary School for the 2016-2017 school year.  Despite the many issues D.L. had in the cross-categorical placement the previous school year, D.L. was again placed in the cross-categorical class for fourth grade. SLPS also refused to modify D.L.'s educational diagnosis of OHI.

19.     In order to minimize chaos at school, Parents enrolled D.L. several days after school started, brought him to school after school busses discharged other students, picked him up before school ended, and sent his private therapist to school with him for three school days. Unfortunately, his behaviors at school decompensated immediately.  He hit, bit and kicked staff, and attempted to elope from school on multiple occasions.  He engaged in self-injurious behaviors at home, and Parents were extremely concerned for his safety.  School administrators considered other placement options for D.L., including homebound, but ultimately determined the school was "not equipped to meet his present level needs."  D.L. could only attend school for

parts of seven school days before Parents were forced to admit D.L. into a residential facility on the advice of Dr. Constantino.

20.     In September 2016, Parents and Dr. Constantino placed D. L. in a private residential program at Great Circle in Webster Groves, Missouri. This placement was medically necessary, paid for by the parents' private health insurance, and intended to preserve D.L.'s health and safety. In particular, the placement was necessary to supervise a change in D.L.'s medication regime. Initially, D. L. attended the Great Circle day school program until a place opened in the residential program. After about a week, D.L. was moved to Great Circle's residential program. Overall, D.L. attended Great Circle from September 6, 2016 to November 11, 2016. Parents observed D.L. make behavioral improvements and some academic progress at Great Circle and were told by Great Circle staff that he made progress under their care. The Great Circle Discharge Summary indicated "[c]ontinued day treatment" at Great Circle was appropriate, so Parents initially expected that D.L. would continue to attend the Great Circle day program for special education services.

21.     After D.L.'s medication was changed during his time at Great Circle, D.L. began developing symptoms of ataxia, or involuntary muscle movements that affected his gait and coordination. This resulted in significant decreases in his fine and gross motor skills. The staff at Great Circle did not recognize these ataxia symptoms and did not communicate this information to SLPS.

22.     In September 2016, SLPS unenrolled D.L. from the District without notice to Parents after he began receiving services at Great Circle. Parents sought to reconvene the IEP meeting in October 2016, before D.L. was discharged from Great Circle, to facilitate his transition from the residential program. Only then were Parents advised that SLPS unilaterally

withdrew D.L from school and that SLPS would not hold an IEP meeting for D.L. until he was reenrolled. SLPS eventually agreed to allow D.L. to reenroll on the morning of November 7, 2016 and to conduct a new IEP meeting the same afternoon.

23.     In advance of this meeting, Parents consulted with Dr. Constantino and sent SLPS a lengthy message outlining Dr. Constantino's recommendations for future services for D.L. Dr. Constantino's primary recommendations included a special education placement in a program that addressed D.L.'s ADHD and autism diagnoses – other than a placement for students with emotional disturbances or behavioral disorders – as well as a proactive sensory diet with breaks, deep pressure, and fine motor activity throughout the day, and occupational therapy, language therapy and social skills training. No one from SLPS ever contacted Parents or Dr. Constantino about these recommendations.

24.     At the IEP Team meeting in November 2016, the IEP Team made no modifications to D.L.'s previous goals and objectives despite D.L.'s recent difficulty at Mullanphy, his medication changes and his seven-week stint in a residential treatment program. They again rejected an educational diagnosis of autism and placement in an autism specific program. Instead of providing additional support to D.L., the team decided to eliminate services and terminated his direct occupational therapy services entirely.

25.     Although Great Circle's discharge summary indicated continued placement in Great Circle's day program would be appropriate for D.L., the team decided Great Circle was "too restrictive" for D.L. While the team members claimed Great Circle was "too restrictive" for D.L., they also made it clear that he was no longer welcome at Mullanphy. Mullanphy's occupational therapist wrote, "We do not need [D.L.] back at our school. It's bad enough."

8

26.     Great Circle being "too restrictive" and Mullanphy being "bad enough," the team decided instead to place D.L. at a public separate placement at Educational Therapeutic Support at Madison ("Madison"), a school that primarily served students with various emotional disorders.   The team did not give any weight to the fact that D.L.'s downward spiral began in third grade when they pulled him from the self-contained autism classroom and placed him in the cross-categorical classroom that also primarily served students with various emotional disorders. The team did not give any weight to the fact that no student with autism had ever attended Madison at the time of the placement decision.  D.L.'s IEP did not incorporate or even mention any of Dr. Constantino's recommendations.

27.     As Dr. Constantino had already indicated that a program geared towards children with emotional disturbances and behavioral disorders would not be appropriate for D.L., Parents objected to the proposed placement and gave notice to the IEP Team of their intention to make a private placement at public expense.  Nobody from SLPS contacted them after the meeting about Parent's objection to the proposed placement or their intention to make a private placement at public expense.  SLPS never attempted to conduct additional evaluations of D.L., to consult with any of his doctors or service providers, or to meet again with Parents' to address their, and Dr. Constantino's, concerns about the Madison placement.

28.     Parents attempted to visit Madison immediately following the IEP meeting. However, the school could not accommodate them until November 16, 2016. At that time, Parents and Katee Thormton, a social worker from St. Louis Office for Developmental Disability Resources, visited Madison for about two hours.  They were impressed with the school's program director, Marvin Echols, but were advised by him that Madison was a program exclusively for students with emotional disabilities. He told the parents and Ms. Thornton that

9

Madison was short-term program of perhaps six to eight weeks and that no student with autism or any other developmental disability had ever attended the program. He also told the parents there was no sensory room or occupational therapy on the premises. Mr. Echols has no experience teaching children with autism and believes Madison would not be an appropriate placement for a child with autism who has no control over his behavior. Following the meeting, Parents, Ms. Thornton and Dr. Constantino agreed that Madison would not serve D.L.'s needs. On November 18, 2016, Parents filed their *pro se* request for a due process hearing with SLPS and the Department of Elementary and Secondary Education.

29.     Parents enrolled D.L. at Giant Steps, a small private school serving students with autism, on December 5, 2016. He has attended Giant Steps since that time. Prior to D.L.'s admission, Dr. Constantino recommended this placement to Parents because Great Circle has a good reputation and experience serving students with autism plus other complicated disabilities. D.L. visited the school on multiple occasions prior to his enrollment, and Giant Steps staff advised Parents that they thought D.L. would work well at the school. Parents learned that all teachers at Giant Steps were certified special education teachers, all classes were very small, and all students receive occupational therapy, music therapy, language therapy, and social skills training. Giant Steps is licensed by the State of Missouri to serve students with autism and emotional disabilities. Giant Steps is also experienced in serving other students from SLPS and the Special School District of St. Louis County. Since D.L. enrolled at Giant Steps, he has made good academic progress in reading, writing, math and especially science, he continues to exhibit difficult behaviors but is gradually improving in transitioning from preferred activities to less preferred, and Dr. Constantino describes D.L's program and placement at Giant Steps as successful.

10

30.     A two-day Due Process hearing was eventually held on April 5, 2017 and April 6, 2017 before the Administrative Hearing Commission. Commissioner Renee Slusher entered her decision on May 9, 2017, and a copy of the same is attached hereto as Exhibit A and incorporated herein by reference.

31.     The primary issues at the hearing were whether D.L.'s IEP should have provided for an educational diagnosis of autism, whether his IEP was deficient for its failure to include occupational therapy services, and whether D.L.'s placement at Madison denied him a free appropriate public education. Parents principally sought reimbursement for their tuition and expenses for sending D.L. to Giant Steps.

32.     The Commissioner determined D. L's educational diagnosis of other health impaired was appropriate and an educational diagnosis of autism was not. The Commissioner also determined that SLPS's denial of occupational therapy services did not deny D.L. a free appropriate public education. The Commissioner further determined that SLPS's decision to place D.L. at Madison did not deny him a free appropriate public education.

33.     The decision of the Commissioner was not supported by the evidence and is inconsistent with the IDEA and Missouri law in the following respects:

a)      The Decision is deficient in that it mischaracterizes evidence, fails to consider evidence, and fails to address obvious evidentiary weaknesses in the presentation of SLPS in this case. For example, the Decision credits the testimony of an assistant occupational therapist at Great Circle to the effect that D.L. did not need any sensory input and had no occupational therapy needs. However, the Decision fails even to mention the testimony of D.L.'s occupational therapist, Melanie Wood, who has treated D.L. at Children's Hospital since 2014. Wood testified that D.L.'s fine and gross motor skills had markedly decreased since she

11

began seeing him, that he now had a much greater need for occupational therapy than a typically developing child, and that he cannot learn without regular sensory intervention;

b)      The Decision is deficient in giving deference to the testimony of non-public school employees from Great Circle, whose testimony is not entitled to deference. Most Great Circle witnesses were inexperienced, had very limited contact with D.L., and were not even fully certified or qualified to provide services to a student with autism like D.L. For example, the Commissioner credited the testimony of a Great Circle teacher with a degree in kinesiology, a "provisional" special education certification, and no prior experience teaching students with autism to the effect that D.L. would likely benefit from a class for students with emotional disturbance rather than a class for students with autism, over the testimony of Dr. John Constantino, who is a recognized expert in the field of autism and has treated D.L. since 2012;

c)      The Decision is deficient in deferring to the opinions of SLPS witnesses who all failed to obtain any records of D.L.'s six previous psychiatric hospitalizations, despite the on-going duty of these witnesses to fully evaluate D.L. in all areas of suspected disability, and who therefore did not know how or why SLPS's previous special education programs and services for D.L. were directly associated with each of these hospitalizations;

d)      The Decision is deficient in deferring to the content of SLPS's records when its witnesses did not testify to or explain these records. For example, the Decision states that, during kindergarten and first grade at Epworth, there was no indication in the record that D.L's negative behaviors increased due to the student make-up of his classes even though there was no testimony from any SLPS witness to this effect at the hearing.

e)      The Decision is deficient in failing to employ the correct legal standard for determination of a free appropriate public education; namely, that a school must offer an IEP

reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances. According to Dr. Constantino, the one defining characteristic of appropriate educational services for D.L. was and is a program to address his diagnosis of autism. Dr. Constantino also testified that placing D.L. with students with behavioral disorders would only exacerbate his PTSD, increase his negative behaviors, and result in his failure to learn – all of which occurred when D.L. was taken out of the self-contained autism classroom and placed with students with behavioral disorders in the third and fourth grade.

f)      The Decision is deficient in denying tuition and expense reimbursement to the Parents despite evidence that SLPS denied D. L. a free appropriate public education, the proposed placement of D.L. at Madison was inappropriate, and Parents' choice of Giant Steps was likely to result in significant educational benefit to D.L. so that Parents are entitled to reimbursement of their tuition, costs and expenses for that program.

## COUNT I

34.     Plaintiffs reallege and incorporate herein by reference the allegations of paragraphs 1-26 of this Complaint.

35.     Defendant's actions described above denied D.L. a free appropriate public education, in violation of the IDEA and Missouri law, and the order and decision of the Commissioner should be reversed for failure to decide that SLPS had denied a free appropriate public education and an appropriate placement for D.L, for failure to order occupational therapy services for D.L., and for failure to order private school tuition and expense reimbursement to Parents.

## PRAYER FOR RELIEF

36.     WHEREFORE, the Plaintiffs pray for an Order as follows:

13

a)     That this Court assume jurisdiction over this action;

b)     That this Court declare that the decision of the Commissioner in this cause

denies D.L. a free appropriate public education;

c)     That this Court order compensatory educational services for D.L., namely

reimbursement of the Plaintiffs' private school tuition and expenses;

d)     That this Court award the parents their costs, expenses and reasonable

attorney's fees; and

e)     For such other and further relief as this Court deems just and proper.

Respectfully submitted,

*/s/ Thomas E. Kennedy, III*
Thomas E. Kennedy, III #46617
Sarah Jane Hunt #63899
Law Offices of Thomas E. Kennedy, III, L.C.
906 Olive St., Ste. 200
St. Louis, MO 63101
(314) 872-9041
(314) 872-9043 fax
tkennedy@tkennedylaw.com
sarahjane@tkennedylaw.com

**ATTORNEYS FOR PLAINTIFF**